## BURTON v. SCHWARTZ et al.

### No. 12425.

Court of Civil Appeals of Texas. Fort Worth. Feb. 7, 1931.

Rehearing Denied March 28, 1931.

Marvin H. Brown & Son, of Fort Worth, for appellant.

Slay & Simon, of Fort Worth, for appellees.

BUCK, J.

This suit was filed by Willard Burton against Joe Schwartz and his five minor children, Thelma, David, Irving, Estelle, and Eleanor Schwartz. The suit was for the purpose of foreclosing a claimed lien on a piece of property located at 1700 Sixth avenue and occupied since some time in 1920 by the Schwartz family as a homestead. Plaintiff also sued J. C. Buchanan as an indorser of some $11,000 worth of notes. Mrs. Schwartz died prior to the filing of the suit, and her husband, Joe Schwartz, and his five minor children, through a guardian ad litem, answered, as also did J. C. Buchanan. The controversy in the court below was as to whether the lien had been fixed on the home-

stead prior to the beginning of the building as provided by the Constitution of the State of Texas and of the statutes pertaining thereto.

After the completion of the evidence, the trial court instructed a verdict for the defendants as against the claim of Willard Burton, and instructed a verdict for Willard Burton against J. C. Buchanan. The court entered judgment for the Schwartz family as against the claim of Willard Burton and for Willard Burton against J. C. Buchanan. From this judgment the plaintiff below, Willard Burton, has appealed.

### Opinion.

The evidence of Willard Burton tends to show that the notes in question were executed by Joe Schwartz and his wife, Fannie Schwartz. The testimony shows that Mr. Buchanan started building the house without the execution by Schwartz and wife of any lien or written contract. The work was begun some time in January, 1920, and it was not until some time in June, 1920, that a deed was executed by Schwartz and wife to Buchanan, and a reconveyance was executed by Buchanan to Mr. and Mrs. Schwartz, reserving a lien to the amount of the notes.

The testimony further showed that in 1924 Joe Schwartz was adjudged a bankrupt, and that he included in his liabilities the amount of these notes, and that he was relieved from the payment of these notes.

Mr. Burton, testifying for himself, said that he was president of the Burton-Lingo Lumber Company and was president of that company in June, 1920. That he had known Mr. Buchanan for more than thirty years and knew that he was a contractor in June, 1920. That he had many transactions with Mr. Buchanan and had sold him much material and lumber. That it was his remembrance that "we had purchased these $8,000 worth of notes." By "we" he meant the Burton-Lingo Lumber Company. That he could not say positively at the time of testifying whether the Burton-Lingo Lumber Company was the owner of the notes at this time or not. That he could not say whether their money, or the money of a widow, living at Cleburne, a Mrs. Bentall, had purchased the notes. That he was inclined to think that it was his money that went into the notes, but that he could not swear whether it was his money or the money of Burton-Lingo Company. That at the time of the purchase of the notes, Mr. Buchanan owed the Burton-Lingo Lumber Company some money. That Mr. Buchanan had furnished all the material for Schwartz and had gotten nothing for it, and that he thought Buchanan owed "us" for it at the time; that he could not say whether the money that he paid for the notes, or the money paid belonging to Mrs. Bentall, went to the Burton-Lingo Lumber Company in pay-

ment of material that Mr. Buchanan had purchased from the Burton-Lingo Lumber Company or not. Mr. Burton was asked whether or not the books of Burton-Lingo Lumber Company would reflect that this money actually went into the assets of the company. He answered: "I would imagine that it went into the assets of Burton-Lingo Lumber Company in payment of material that Mr. Buchanan had purchased from the Burton-Lingo Lumber Company, but I could not swear positively about that, but it is my recollection that is what happened." He was asked whether or not the Burton-Lingo Lumber Company purchased these notes for the purpose of paying the debt that Mr. Buchanan owed it. He answered, "It was done to accommodate Mr. Buchanan." He further testified that the notes not being paid at maturity, he, for Burton-Lingo Lumber Company, paid Mrs. Bentall the amount of her money that had gone into the notes.

The evidence further showed that Joe Schwartz expected to get a loan from his uncle, D. H. Keene, who, prior to this time, had moved from Fort Worth to Los Angeles. That after the building had progressed considerably, he learned that Mr. Ross, of the firm of Ross, Ross & Alexander, leading attorneys, had declined to pass the title for Mr. Keene and that Mr. Keene had refused to loan his nephew the money needed. He further testified that he did not know whether Burton-Lingo Lumber Company sold the notes to a Mr. Locke; that he could not say whether "we" owned these notes at the time the first note became due or not.

Mr. J. C. Buchanan testified that he did not know whether he ever had built any other house to be used as a homestead or not prior to this time; that they had been working on the house some time and the work was practically done when the deed from Schwartz and wife to him and the deed back from him to Schwartz and wife was executed, and put on record. That they began the work of erecting the building without any written contract and nothing was given but a verbal authority from Mr. Schwartz. That he remembered at the time of testifying that the record title was taken to Mr. Ross, Mr. Keen's attorney, and Ross told John O'Reilly, Mr. Keene's bookkeeper, that Mr. Keene could not safely make the loan on this property. That at the time the deed was made by Schwartz and wife, he (Buchanan) did not pay any consideration to Schwartz and wife; that when he began the erection of the building he placed Mr. E. S. Newcome in charge of it; that some time in June, 1920, after he had gone to El Paso to live, Mr. Newcome wrote him and he came back to Fort Worth and learned that Mr. Ross had turned down the title and also Samuels & Brown, attorneys; and that he went to his attorney, who advised

him and Mr. Schwartz to execute these deeds, which was done. The deeds were antedated to January 3, 1920.

Mr. E. C. Newcome testified that he had some business relations with Buchanan in 1921–22, and that he severed his connection at the end of 1922. That he had known Mr. Schwartz since the early part of January, 1920. That he wrote for Schwartz on January 3, 1920, this authorization:

"We hereby authorize you to erect our residence as above on all cost price, us paying all bills."

That evidently this order was drawn up and "back dated," because "I knew that we had some material on the ground, and some excavating work had been done, when the contract—when the plans were changed to a two story house." That when he learned that Mr. Schwartz was unable to make further payments on the residence, he went to Mr. Schwartz and talked with him about the condition of the building, and Schwartz told him that his uncle had promised to loan him some money, and that he told Schwartz they could not go any further with the building without his making some arrangements, and that Mr. Schwartz made some efforts and then reported back to witness that he could not get the money from his uncle. That Mr. Schwartz told him that Mr. Keene's attorney had told him that money could not be loaned on the property and also told him the reason why. That he told him the reason why Mr. Keene could not make the loan on the property was because it was a homestead.

Joe Schwartz testified that he moved into the house some time in the latter part of June, or the first of July, 1920; that the building was almost finished then. He testified further:

"They had a little finishing up work to do, and they were working on it while we were in there. My wife and I would usually move some little things over there every time that we would go to look at the building. They built a servant's house and a garage on the premises first, and those buildings were finished up, and that was finished perhaps a month after they agreed to build it, and my wife and I would usually bring some things over there every time that we would go to see the building."

He further testified that there was no written contract before the work was begun; that he went to Samuels & Brown, attorneys, and Mr. Brown asked him where was the lien. That subsequently, in June, he and Mr. Buchanan went to see Mr. Buchanan's lawyers and they told the witness for him and his wife to execute a conveyance of the property to Buchanan, and Buchanan would reconvey it, reserving a vendor's lien, which was done. That the deed from Buchanan to Schwartz was received by him

some weeks or months later, and was put of record September 21, 1920. That he went to Burton-Lingo Lumber Company's office some time immediately prior to June, 1922, about getting an extension. That he was legally discharged from this debt in the bankruptcy court in 1924.

Mr. James H. McGeehee, a bookkeeper for Burton-Lingo Lumber Company, testified that the books showed that on September 22, 1920, they gave Mr. J. C. Buchanan a check for $6,000, and also on the same day they gave him a check for $5,000; that R. B. Locke was interested in the notes and the lien as their books reflected, and that he furnished a part of the cash which merely passed through the books. That the books showed that on September 27, 1920, they received a check from R. B. Locke for $5,000, and gave credit for that amount, and the books also showed that they gave Locke their note for $6,000 and gave his account credit for that. That the books showed that there were two checks given to Mr. Buchanan, one for $5,000 and one for $6,000; that he knew that these checks were given with reference to the Joe Schwartz notes; that the record showed that the first check written was on January 12, 1924, for $320, which seemed to be about 8 per cent. interest on $8,000 for six months. That Burton-Lingo Lumber Company gave Mrs. Bentall a check for that amount and then charged it to the account of Mr. Buchanan. That on June 12, 1924, and on December 6, 1924, checks were made payable to Mrs. Bentall for $320, and also on June 4, 1925, a check was made payable to her for $320, and on December 12, 1925, a check was made payable to her for $320, and also on June 27, 1926. That all of these checks were charged to the account of J. C. Buchanan. That he believed that the record showed that Mrs. Bentall came in after the Locke transaction.

 We think the evidence shows beyond a question of doubt that no lien was executed by Schwartz and wife on the lot in question until most of the improvements had been finished. Therefore, we conclude that the trial court was authorized to hold that no lien was fixed on the homestead as required by law.

In Sanger Bros. v. Brooks, 101 Tex. 115, 105 S. W. 37, the Supreme Court held that where a husband and wife executed a deed of their homestead to a creditor of the husband, who, as a part of the same transaction, reconveyed the property to the husband, reserving a vendor's lien to secure alleged purchase money notes, which transaction was simulated to evade the Constitution, prohibiting a mortgage or lien on a homestead, a subsequent purchaser of the notes was charged with notice by the record of such conveyance thereof, and was not entitled to enforce the lien as a bona fide purchaser. In this case the conveyance by the husband and wife of the

homestead was on the same day as the reconveyance to the husband, with a note purporting to be for the purchase money and to be secured by a vendor's lien reserved in the deed. The court held that the transaction was simulated for the purpose of fixing on the homestead an incumbrance securing a debt of the husband for a stock of goods bought by him from the person so secured, and it was held that a purchaser of the notes and lien was taxed with notice of the nature of the transaction from the fact that the deed and reconveyance were contemporaneous, and was not protected, as an innocent purchaser, against the homestead claim.

Appellant urges that the case of West End Town Co. v. Grigg, 93 Tex. 451, 56 S. W. 49, 50, by Judge Brown of the Supreme Court, definitely decides that a lien was fixed on this piece of property for the security of the notes stipulated in the deed. In this case the trial court found that F. B. Grigg and wife owned lots 28 and 29, block 7, of the West End Town Company's First addition to San Antonio; that these lots were purchased for the purpose of a home for Grigg and wife; that Grigg and wife desired to erect for themselves a dwelling on said lots, and to this end made application to the West End Town Company for a loan sufficient to erect said building, and were informed by the company that it could not make a loan to them; that the company later notified Grigg and wife that if they would transfer the property to the West End Town Company, it would have the building erected upon the lots, and then reconvey the lots with the dwelling thereon to Grigg and wife, for the cost of said dwelling. This was done, and the trial court found that, as a matter of law, the lots did not constitute the homestead of Grigg and wife, and therefore rendered judgment for the debt as against Grigg and wife and foreclosed the lien. The Supreme Court said:

"The trial judge did not express a conclusion of fact as to the existence of the homestead right, but, as a conclusion of law, he decided that the property was the homestead of Grigg and wife at the time of the transaction, and not subject to the lien. If the trial court had found, as a conclusion of fact from the evidence, that the homestead right existed at the time Grigg and wife entered into the contract which is evidenced by the several instruments made by the parties, then we would have been confined to the question, is there any evidence upon which that conclusion could be based? But the conclusion of law expressed by the court will not be considered as a conclusion of fact, and we will proceed to determine whether the facts found made the property the homestead of Grigg and wife before and at the time of the transaction involved in this litigation. Edwards v. Chisholm (Tex. Sup.) 6 S. W. 558. The purpose of Grigg and wife to establish their homestead upon the lots at some future time, if able to erect a residence upon it, did not make it a homestead, but the making of the contract under which that residence was built, concurring with the intent to occupy it, fixed the homestead right from that time. * * * The agreement between Grigg and the builder for the erection of a residence upon the lots in question, with the notes of Grigg and wife to the West End Town Company for the price of the work, formed a contract for the improvement, and the conveyance of the lots by Grigg and wife to the plaintiff in error and the reconveyance to them constituted a mortgage to secure the notes. The instruments were all executed at the same time, and, when the contract for the building became binding, the lien of the mortgage to secure the notes became effective and attached to the lots in question. No homestead exemption existed prior to the last act by which the transaction was completed, but, the intention to occupy continuing with Grigg and wife, the constitutional immunity from debts then arose in their favor as to future transactions, but did not invalidate the lien which had attached to the lots."

■■ We think the evidence in this case shows that it was the intention of Schwartz and wife to occupy this lot as their homestead, and the homestead character attaches to a piece of property which is acquired with the intention of making it a home, when the persons owning the same by some overt act show the intention of making it a homestead, such as moving on the lot, excavating, etc.

In the case of Cameron v. Gebhard, by the Supreme Court of Texas, 85 Tex. 610, 22 S. W. 1033, 1035, 34 Am. St. Rep. 832, it is said:

"It is apparent that intention is almost the only thing that may not be dispensed with in some state of case, and it follows that this intention in good faith to occupy is the prime factor in securing the benefits of the exemption [homestead exemption]. Preparation— that is, such acts as manifest this intention— is but the corroborating witness to the declaration of intention, the safeguards against fraud, and an assurance of the bona fides of the declared intention of the party."

In the case of Espinoza v. Cocke, 276 S. W. 1095, by the Commission of Appeals, Espinoza, after purchasing an empty lot with the intention of erecting a homestead thereon, proceeded to level off the lot and to inclose it with a fence and to clear off some vegetation, and then entered negotiations with a lumber company for the building of a home. The court held that such a definite intention in good faith to occupy vacant property as a homestead, when followed by preparatory acts in connection with the property definitely tending of themselves to show such intention, established a homestead for Espinoza and his wife.

In the case of Harkrider-Keith-Cooke Co. v. Smith, 284 S. W. 612, 614, the Court of Civil Appeals at Austin said:

"The acquisition of unimproved property with the intention of its becoming homestead, followed in a reasonable time by acts evidencing that intention and the subsequent actual use and occupancy of the property as a homestead, impresses the homestead character upon the property from the moment of its acquisition."

The Constitution of Texas, art. 16, § 50, provides that no liens or mortgages upon a homestead shall be valid except for purchase money or improvements.

Article 5460, Rev. Civ. Statutes of 1925 provides:

"When material is furnished, labor performed, or improvements as defined in this title are made, or when erections or repairs are made upon homesteads, if the owner thereof is a married man, then to fix and secure the lien upon the same it shall be necessary for the person or persons who furnish the material or perform the labor, before such material is furnished or such labor is performed, to make and enter into a contract in writing, setting forth the terms thereof, which shall be signed by the owner and his wife, and privily acknowledged by her, as is required in making sale of homestead. And such contract shall be recorded in the office of the county clerk in the county where such homestead is situated, in a well bound book to be kept for that purpose. When such contract has been made and entered into by the husband and wife and the contractor or builder, and the same has been recorded, as heretofore provided, then the same shall inure to the benefit of any and all persons who shall furnish material or labor thereon for such contractor or builder."

Since this statute outlines the only way in which the contractor may have a lien upon the lot for the labor done and the improvements placed thereon, and since there is neither pleading nor does the evidence show that the provisions of this statute have been complied with in the instant case, any attempt to fix a lien on the lot was illegal and void and unconstitutional.

We conclude, after reading the authorities cited by appellant and many other authorities, that the plaintiff below and Buchanan, the contractor, showed an absence of even any effort to fix the lien upon the homestead, and that the trial court was authorized and it was his duty to give a peremptory instruction to find for the defendants against the plaintiff. There is no complaint as to the judgment for the plaintiff as against Buchanan, and that judgment is left undisturbed.

The judgment is affirmed.